1
2
3
4
5
6
7
8

## UNITED STATES DISTRICT COURT

9

## SOUTHERN DISTRICT OF CALIFORNIA

10

| | |
|---|---|
| OLIVIA GARCIA, Regional Director of Region 21 of the National Labor Relations Board, for and on behalf of the NATIONAL LABOR RELATIONS BOARD, | CASE NO. 15cv0039-GPC(JLB) |
| Petitioner, | **ORDER GRANTING IN PART AND DENYING IN PART PETITIONER'S PETITION FOR TEMPORARY INJUNCTION PURSUANT TO SECTION 10(j) OF THE NATIONAL LABOR RELATIONS ACT** |
| vs. | |
| HIGH FLYING FOODS, | |
| Respondent. | |

11
12
13
14
15
16
17
18
19

On January 8, 2015, Petitioner Olivia Garcia, Regional Director of Region 21 of the National Labor Relations Board, for and on behalf of the National Labor Relations Board ("Board" or "NLRB") filed a petition for temporary injunction under section 10(j) of the National Labor Relations Act ("Act"). (Dkt. No. 1.) Respondent filed a response on January 29, 2015. (Dkt. Nos. 11, 12.) Petitioner filed a reply on February 4, 2015. (Dkt. No. 15.) Respondent, without leave of Court, filed a supplemental document on February 6, 2015. (Dkt. No. 19.)

A hearing was held on February 6, 2015. (Dkt. No. 18.) Ami Silverman, Esq. appeared on behalf of Petitioner, and Karl Terrell, Esq. and Jacqueline Godoy, Esq. appeared on behalf of Respondent. Based on the briefs, supporting documentation,

20
21
22
23
24
25
26
27
28

1  applicable law, and hearing oral argument, the Court GRANTS IN PART AND

2  DENIES IN PART Petitioner's petition for temporary injunction pursuant to Section

3  10(j) of the Act.

**Background**

5  Respondent High Flying Foods ("HFF") engages in the retail sale of food and

6  beverage products at restaurant outlets at the San Diego International Airport in San

7  Diego, California.  HHF also has locations at airports in San Francisco and Oakland.

8  On February 14, 2014, the majority of the employees of HFF recognized UNITE

9  HERE! Local 30 ("Union") as their exclusive collective-bargaining representative.[1]

10  Respondent recognized the Union as the exclusive collective-bargaining representative

11  of these employees and commenced to bargain for an initial collective-bargaining

12  agreement around May 2014.  In the beginning of May 2014, the Union created a six

13  member employee bargaining committee, which included HFF employees Mirna Soto,

14  Francisco Hernandez and Martin Duarte.  (Dkt. No. 1, Petition, Ex 3, Gutierrez Aff. at

15  49.)

16  The first bargaining session was held on May 15, 2014 and five other bargaining

17  sessions were held on May 14, June 4, 20, July 7 and August 22.  (Id.)  However, a

18  collective bargaining agreement has not yet been agreed upon.  In the middle of July

19  2014, HFF posted a memo to employees regarding the status of contract negotiations.

20  (Id. at 51; 104.)   The memo stated that negotiations were not progressing in a

---

[1]Early on, in 2011 when HFF was bidding for food concessions at the San Diego airport, which was undergoing renovations at the time, it entered into a "card-check neutrality agreement" with the Union. (Dkt. No. 12-1 Resp't NOL, Ex. A, AR at 539-40.) The Union represented the employees of HM Host, the previous food-concession employer. Many employees would be leaving HM Host and seeking employment with the new bid-winning concessionaires.  HFF was aware it needed the union's support to win its bid and agreed to hire former HM Host employees and entered into a "card-check neutrality agreement" which included an "employee retention procedure" where HM Host employees were given preferences in hiring.  These agreements made it easy for the Union to obtain the support of a majority of the employees HFF would be hiring as well as assisted HFF in obtaining the winning bid.  HFF honored the provisions in the agreements and the Union was recognized by a majority of the employees on February 2014. (Dkt. No. 12-1, Resp't NOL, Ex. C.)

productive manner and "due to lack of process as well as loud and offensive language, and personal attacks used by Union officials during the meetings, we have requested the involvement of the FMCA (Federal Mediation and Conciliation Services)." (Id. at 104.)

In the midst of the bargaining, Petitioner alleges that Respondent engaged in various egregious acts and conduct in violation of the Act. First, Respondent unilaterally implemented a new handbook concerning wages, hours and other terms of conditions of employment and is a mandatory subject for purposes of collective bargaining, without bargaining with the Union. HFF then required its employees to acknowledge receipt of the handbook that stated that the employer may change the terms and conditions of employment at any time. Second, Respondent suspended and terminated two employees, Mirna Soto and Francisco Hernandez, because of their Union and other protected concerted activities. Third, Respondent interrogated employees about their union activities, conducted surveillance by photographing a petition signed by employees, and told employees that they were prohibited from talking about the union and soliciting support at any time during work. As a result, the Union filed unfair labor practice charges with the Board over these acts.

On August 26, 2014, UNITE HERE! Local 30 filed the original charge in Case 21-CA-135596. (Dkt. No. 1, Pet., Ex. 1 at 21.) The Union filed a first amended charge on September 11, 2014, (id. at 23), a second amended charge on September 26, 2014, (id. at 25), and a third amended charge on November 7, 2014. (id. at 27.) The third amended charge alleges that Respondent violated Sections 8(a)(1), (a)(3) and (a)(5) by:

    1.    Refusing to bargain collectively with the Union by unilaterally making changes to employment policies affecting terms and conditions of employment by imposing changes to the Employee Handbook; and by bypassing the Union by communicating directly with employees by requiring them to sign an acknowledgment for the Handbook that stated Respondent may change terms and conditions of employment at any time; and

    2.    Discriminating against union supporters by terminating Mirna Soto and suspending her without pay; and terminating Francisco Hernandez and suspending him without pay and imposing discipline against him, to discourage   membership and support of the Union; and

3. Interfering with, restraining, and coercing employees in their exercise of their rights under the Act by maintaining and enforcing an overbroad policy prohibiting employees from discussing the union in the workplace, maintaining and enforcing an overbroad no-solicitation rule; unlawfully interrogating employees about Union and protected activities; and unlawfully surveilling those activities.

(Id. at 28.)

On November 26, 2014, following a field investigation during which all parties had an opportunity to submit evidence on the charge, the General Counsel of the Board, on behalf of the Board, by the Acting Regional Director, issued a Complaint and Notice of Hearing pursuant to Section 10(b) of the Act, 29 U.S.C. § 160(b), alleging that Respondent has engaged in, and is engaging in, unfair labor practices as charged within the meaning of 29 U.S.C. § 158(a)(1), (a)(3), and (a)(5).  (Id. at 29.) Respondent filed an Answer to the Complaint dated December 9, 2014.  (Id. at 43.)  A hearing before the Administrative Law Judge ("ALJ") was held from January 12-16, 2015.  (Dkt. No. 4 at 2.)

On January 8, 2015, Petitioner filed a petition for temporary injunction pending final disposition of the matters at issue pending before the Administrative Law Judge of the National Labor Relations Board.  (Dkt. No. 1.)  Petitioner alleges violations of Sections 8(a)(1), (a)(3), and (a)(5) of the National Labor Relations Act, 29 U.S.C. §§ 158(a)(1), (a)(3) and (a)(5).  On January 29, 2015, Respondent filed a response.  (Dkt. Nos. 11, 12.)  On February 4, 2015, Petitioner filed a reply.  (Dkt. No. 15.)

**Discussion**

Section 10(j) of the Act provides:

The Board shall have power, upon issuance of a complaint as provided in subsection (b) of this section charging that any person has engaged in or is engaging in an unfair labor practice, to petition any United States district court, within any district wherein the unfair labor practice in question is alleged to have occurred or wherein such person resides or transacts business, for appropriate temporary relief or restraining order. Upon the filing of any such petition the court shall cause notice thereof to be served upon such person, and thereupon shall have jurisdiction to grant to the Board such temporary relief or restraining order as it deems just and proper.

29 U.S.C. § 160(j).  "The purpose of a § 10(j) injunction is 'to protect the integrity of the collective bargaining process and to preserve the Board's remedial power while it processes' an unfair labor practice complaint." Frankl v. HTH Corp., 650 F.3d 1334, 1341 (9th Cir. 2011) (quoting Miller v. Cal. Pac. Med. Ctr., 19 F.3d 449, 459–60 (9th Cir. 1994) (en banc) ("Frankl I")).

In order to obtain a § 10(j) injunction, Petitioner "must establish that he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor, and that an injunction is in the public interest." Id. at 1355 (quoting Winter v. Nat. Res. Def. Council, 555 U.S. 7, 21 (2008)).  "'[S]erious questions going to the merits and a balance of hardships that tips sharply towards the plaintiff can support issuance of a preliminary injunction, so long as the plaintiff also shows that there is a likelihood of irreparable harm and that the injunction is in the public interest." Alliance for the Wild Rockies v. Cottrell, 632 F.3d 1127, 1135 (9th Cir. 2011).  Petitioner "must establish that irreparable harm is *likely*, not just possible, in order to obtain a preliminary injunction." Id. at 1131 (emphasis in original); see Small v. Operative Plasterers' and Cement Masons' Int'l Ass'n, Local 200, 611 F.3d 483, 491 (9th Cir. 2010) (observing that Winter abrogated Miller's holding that a mere "possibility of irreparable harm" can be adequate); McDermott v. Ambersand Pub., LLC, 593 F.3d 950, 957 (9th Cir. 2010) (same). "[T]he court must evaluate the traditional equitable criteria through the prism of the underlying purpose of section 10(j), which is to protect the integrity of the collective bargaining process and to preserve the Board's remedial power." Id. (citation omitted).

Once a complaint is filed with the Board, an ALJ holds a hearing on the complaint and prepares a decision containing findings of fact, conclusions of law, and recommendations as to the disposition of the case. 29 C.F.R. §§ 102.35, 102.45. The ALJ's decision, however, is not final.  See 29 C.F.R. § 102.45. Only the Board, after either adopting or rejecting the ALJ's decision, can provide relief. 29 C.F.R. § 102.48. Further, anyone aggrieved by the Board's final order can obtain review of the order in

1  a United States court of appeals.  29 U.S.C. § 160(f).  During this process to reach the

2  Board's decision, in order to preserve the lawful status quo that existed before an

3  employer's unfair labor practices, Congress accorded the Board authority to seek a

4  temporary injunction pursuant to section 10(j).  <u>See</u> 29 U.S.C. § 160(j).

5      In this case, Petitioner alleges Respondent violated Sections 8(a)(1), (a)(3), and

6  (a)(5) of the Act.

7  **A.    Likelihood of Success on the Merits**

8      Petitioner alleges that there is a strong likelihood that she will establish that

9  Respondent violated Sections 8(a)(1), 8(a)(3), and 8(a)(5) of the Act by committing

10  unfair labor practices after the employees selected the Union to be their exclusive

11  collective-bargaining representative and before the parties could complete negotiations

12  and agree upon an initial collective-bargaining agreement.  Respondent disagrees.

13      In evaluating this factor, the district court should "factor in the district court's

14  lack of jurisdiction over unfair labor practices, and the deference accorded to NLRB

15  determinations by the court of appeals."  <u>Frankl I</u>, 650 F.3d at 1355 (citing <u>Miller</u>, 19

16  F.3d at 460).  The Regional Director must show a "probability that the Board will issue

17  an order determining that the unfair labor practices alleged by the Regional Director

18  occurred and that this Court [Ninth Circuit] would grant a petition enforcing that order,

19  if such enforcement were sought."  <u>Frankl v. HTH Corp.</u>, 693 F.3d 1051, 1062 (9th Cir.

20  2012) ("<u>Frankl II</u>"); <u>Small v. Avanti Health Sys.</u>, 661 F.3d 1180, 1187 (9th Cir. 2011).

21  The "regional director in a § 10(j) proceeding 'can make a threshold showing of

22  likelihood of success by producing some evidence to support the unfair labor practice

23  charge, together with an arguable legal theory.'" <u>Frankl I</u>, 650 F.3d at 1356 (quoting

24  <u>Miller for & on Behalf of NLRB v. Cal. Pac. Med Ctr.</u>, 19 F.3d 449, 460 (9th Cir.

25  1994)); <u>see also</u> <u>Scott ex rel. NLRB v. Stephen Dunn & Ass.</u>, 241 F.3d 652, 662 (9th

26  Cir. 2001) <u>abrogated on other grounds as recognized by</u> <u>McDermott</u>, 593 F.3d at 957

27  ("[T]o satisfy the 'likelihood of success' prong of the traditional equitable test, [the

28  Director] need only show a better than a negligible chance of success.").  However, if

"the Director does not show that success is likely, and instead shows only that there are serious questions going to the merits, then he must show that the balance of hardships tilts sharply in his favor, as well as showing that there is irreparable harm and that the injunction is in the public interest. See Alliance for the Wild Rockies, 632 F.3d at 1135.

Conflicting evidence in the record "does not preclude the Regional Director from making the requisite showing for a section 10(j) injunction." Frankl II, 693 F.3d at 1063; see also Seeler v. Trading Port, Inc., 517 F.2d 33, 36-37 (2d Cir. 1975) (where "there are disputed issues of fact in the case, the Regional Director should be given the benefit of the doubt in a proceeding for § 10(j) relief").   In a 10(j) petition for injunctive relief, it is not the duty of the district court "to resolve either the factual disputes or the legal issues involved.  Those are for the Board." Kennedy v. Teamsters, Chaufferus, Warehousemen & Helpers, Local 542, 443 F.2d 627, 630 (9th Cir. 1971).

**1.    Section 8(a)(1)**

Section 8(a)(1) provides that it "shall be an unfair labor practice for an employer (1) to interfere with, restrain, or coerce employees in the exercise" of their rights to organize and bargain collectively."[2]  29 U.S.C. § 158(a)(1).

Petitioner alleges that prohibiting employees from discussing or soliciting support for the union during work hours; interrogating employees about their or other employees' union support and activities; and engaging in surveillance of employees engaging in union activity by photographing them are acts in violation of Section 8(a)(1).

### i.    Prohibiting Union Talk During Work Hours

Petitioner contends that Respondent repeatedly told employees that they could not solicit support for the Union or even talk about the Union during work.  Managers told Hernandez that he could not talk to his coworkers at work about "outside business"

---

[2]"[A] violation by an employer of any of the four subdivisions of Section 8, other than subdivision one, is also a violation of subdivision one."  Frankl I, 650 F.3d at 1356.

such as the union or solicit them to sign a petition supporting the Union's negotiation efforts during work hours.  (Dkt. No. 1, Pet., Ex. 3, Hernandez Aff. at 126, 129.) Second, employee Duarte was also instructed several times that he could not solicit others to sign a Union petition or talk about the Union during work.  (Id., Duarte Aff. at 139, 140.)

On June 27, 2014, at the end of his shift, Duarte brought a petition to work to have employees sign and kept it in his backpack.  (Id. at 138.)  The petition was on a cart and Joe Billones, a manager for the Counter outlet asked what the folder was.  (Id. at 139.)  When Durate grabbed the folder and said, "Oh", Billones said "you can't be doing that here."  (Id.)  Then around June 28 or 29, 2014, Duarte was on a break near the end of his shift when he saw a coworker, Victor Lopez.  (Id. at 139-40.)  Lopez said he was going on break and answered "yes" when asked if he wanted to sign the petition.  (Id. at 140.)  As Duarte was handing Lopez the petition, Counter Manager Billones walked by and said "You're doing that again."  (Id.)  Duarte responded that Lopez was going on his break.  (Id.)  Billones replied, "you can't be doing that here, sir" and that it was company policy.  (Id.)  Duarte asked if he could just hand the petition to Lopez but Billones just walked away.  (Id.)

Around July 18, 2014, Manager Eddie Almada asked to speak with Duarte.  (Id.) Almada said that it was company policy to not speak about the union during work hours.  (Id.)  Duarte was not sure what he was talking about but he remembered having a brief conversation with a coworker Javier Hernandez about the union while they were washing dishes about an hour before and then briefly again while standing in front of the posted schedule.  (Id.)  Duarte said he thought employees could talk about the union as long as it did not interfere with work or stop work production.  (Id.)  Almada said it was company policy to not speak about the union.  (Id. at 141.)

Later the same day, Steve, another manager asked Duarte to go downstairs where the management offices are located.  (Id.)  They went to the office of HR Director Carrie Williams.  (Id.)  Williams inquired about the fact that Duarte talked with Javier

Hernandez about the union and how it stopped work production. (Id.) She also asked about the petition he was handing out. (Id.) Duarte stated that he thought he could talk about the union as long as it did not interfere with work or stop work production. (Id.) Both Williams and Steve shook their heads "yes" and Steve said "right." (Id.)

Then around July 22, 2014, Steve took Duarte to meet with Williams again. (Id.) He received a written verbal warning for talking about union business matters on July 18. (Id.; Ex. B at 147.) The notice stated that Duarte was violating company policy prohibiting personal business during working hours when Duarte was seen conducting business with another employee while on the clock and both employees were not performing any work duties while the conversation was taking place. (Id., Ex. B at 147.) At the meeting, Steve said that union was a business and it violated company policy. (Dkt. No. 1, Pet., Duarte Aff. at 141-42.)

About a week later at the end of July 2014, Duarte was cleaning out a filter in the mop sink and Damien Wormwood (sic), who recently joined the bargaining committee and on his lunch break asked Duarte a question about the union. (Id. at 142.) Duarte continued working during the conversation. (Id.) Duarte saw Almada walk into the area and then saw him speaking with Damien for a moment. (Id.) Then Alamada asked Duarte to step outside to talk. (Id.) Almada said he could not solicit a third party while on work hours. (Id.) While Duarte explained that Damien was not a third party because he was already part of the union, Almada just repeated what he said. (Id.) Damien later said managers of HFF did not talk to him about the incident and Duarte was not disciplined for the incident. (Id.)

According to Damien Rossworn, while he was on break, he asked Duarte questions about being on the bargaining committee. (Id., Rossworn Aff. at 160.) During the conversation, Assistant Manager Eddie Almada walked by and did not say anything. (Id.) As the conversation ended, Eddie approached Rossworn and asked what they were talking about. (Id.) He told Eddie the specifics as to the conversation. (Id.) After that, he saw Eddie approach Duarte and took him to an area to talk. (Id.)

Duarte later told Rossworn that Eddie told him not to talk about the union.  (Id.)  After Soto and Hernandez were terminated and seeing how management treats Duarte, Rossworn states he is scared management might discriminate against him for his union activity.  (Id.)  He and his co-workers used to talk more openly about the union but that has changed and none of the other employees talk about the union anymore.  (Id. at 161.)

In opposition, Respondent argues that the managers did not restrain discussion between employees based on the subject matter being union-related but their sole concern was preventing interference with work.  Respondent argues that its comments about not talking about the union during working hours because it was outside business emanated from the HFF managers' concern that the inherent nature of "outside business" would have a distracting impact on the ability of one to work.  Respondent argues that its managers were not focused on the content of the discussions and no employees were ever disciplined for talking about the union during break times.  They were aware employee could talk about union activities as long as it did not interfere with work.

"[A]n employer may forbid employees from talking about a union during periods when the employees are supposed to be actively working, if that prohibition also extends to other subjects not associated or connected with the employees' work tasks.  However, an employer violates the Act when employees are forbidden to discuss unionization, but are free to discuss other subjects unrelated to work."  Steven Const. Corp., 350 NLRB No. 132, 134 (2007) (citing Sam's Club, 349 NLRB 1007, 1009 (2007) (quoting Jensen Enterprises, 339 NLRB 877, 878 (2003)).  Here, employees testified that employees routinely discuss topics during work time and no employee has been disciplined for that.

Westlye, the CEO of HFF, testified that the managers were instructed to allow discussion and activities during work as long as they are not disruptive to the work being performed.  (Dkt. No. 12-1, Resp't NOL, Ex. A, AR at 1118.)  When asked

whether it would be inappropriate to talk about union issues while working, Westlye responded, "No, we fully expected the employees would be talking about union issues." (Id.)  However, in an internal email regarding the suspension of Francisco Hernandez, in response to an email from Palaez that Francisco was talking to Jesse about the union while Jesse was on the clock and Hernandez was on break, Westlye wrote, "If we set up a quick meeting with Francisco (2 mgrs) so we have a witness) we can simply ask him if he was discussing the union with Jesse.  If he says yes he was we can suspend him and talk further."  (Dkt. No. 15 at 21-22.)  This demonstrates conflicting facts by the CEO as to the policy about talking about the union during work hours.

Duarte was disciplined on July 22, 2014 for discussing union business matters during work. (Dkt. No. 1, Duarte Aff., Ex. B at 147.)  Hernandez was also disciplined and suspended for discussing union matters during work. (Dkt. No. 1, Hernandez Aff. at 129; Dkt. No. 15 at 15.)  Employees were allowed to discuss other topics during work hours as long as it did not disrupt their work productivity.  Therefore, the asserted company policy voiced by many managers prohibiting employees from talking about the union or soliciting support during work hours violates the Act.  See Steven Const. Corp., 350 NLRB No. at 134.  Accordingly, the Court concludes that Petitioner demonstrated that there is likelihood of success on the merits that Respondent violated Section 8(a)(1) by prohibiting Union talk or soliciting support for the union during work hours.

### ii.   Interrogating Employees

Petitioner alleges that Respondent questioned Hernandez about his speaking to other employees about the union and also questioned the employees to whom he had spoken.[3]  Respondent also questioned another employee to whom employee Soto was talking to.

---

[3]Petitioner provides this summary statement without citing to the record to support her assertions.  (Dkt. No. 1-2 at 15-16.)  The Court does not know what incident Petitioner is referencing.

[15cv0039-GPC(JLB)]

An employer can also violate Section 8(a)(1) by improperly interrogating employees about their union activities. See Southwire Co., 282 N.L.R.B. 916, 917 (1987). The test for evaluating interrogations is "whether under all the circumstances the interrogation reasonably tends to restrain, coerce, or interfere with rights guaranteed by the Act." Id.; Bill Johnson's Restaurants, Inc., v. NLRB, 660 F.2d 1335, 1342 (9th Cir. 1981). The test is whether the interrogation tends to be coercive, not whether the employee was in fact coerced. Bill Johnson's Restaurant, 660 F.2d at 1334. The Act is violated if the interrogation has a tendency to intimidate employees in the exercise of their protected rights, even if there is no evidence of actual intimidation. NLRB v. Anchorage Times Publishing Co., 637 F.2d 1359, 1364 (9th Cir. 1981).

> An employer's interrogation must be associated with "express or implied threats or promises, or form part of an overall pattern tending to restrain or coerce employees with regard to their protected activities. . . . When the inquiries are not undertaken in a threatening manner but are only isolated instances free of coercion and without any systematic intimidation in the background, they are not unlawful.

Amalgamated Meat Cutters and Butcher Workmen of North America, Local No. 364 v. NLRB, 435 F.2d 668, 669 (9th Cir. 1970). However, union topics that arise during casual conversation between employers and employees are not necessarily coercive. Hotel Employees and Restaurant Employees Union, Local 11 v. NLRB, 760 F.2d 1006, 1009 (9th Cir. 1985).

Soto had a conversation with a fellow employee, Jorge Romero where a manager of HFF later questioned him about his conversation with Soto and told him he could not talk about the Union at work. (Dkt. No. 1, Romero Aff. at 157.) In his affidavit and similarly when he testified at the hearing, Romero stated that when he was pushing a utility cart to Artisan Market, he saw Mirna Soto and stopped to talk to her. (Dkt. No. 12-1, Resp't NOL, Ex. A, AR[4] at 414.) They had a three to five minute conversation

---

[4]The AR page numbers are based on the transcript page number, not CM/ECF pagination.

where they caught up with each other.  (Id. at 415.)  At the end of the conversation, Soto brought up the Union and inquired as to whether Romero attended any meeting and encouraged him to attend.  (Id. at 415.)  Romero said he saw Pete Contreras, the General Manager at Stone Brewing, as the conversation was ending.  (Id. at 416-17.)  When Contreras saw Romero, Contreras waived at him motioning for him to return to work.  (Id. at 417.)  Then a few minutes after Romero arrived at Artisan Market, Contreras came up to him and inquired as to what he and Soto were talking about.  (Id.)  When Romero responded, "work related stuff" Contreras repeatedly asked "three times" what they were talking about before Romero told Contreras that he was catching up with her and she mentioned the Union to him.  (Id. at 419.)  Contreras told Romero that, "I just want to let you know to" – "to basically watch what like you're talking about.  And I'm just looking out for you, so I just want to like give you a heads up, you know, that you can't talk about the Union while you're on the clock."  (Id. at 419.)

As to this incident, the repeated questioning about what Romero and Soto were talking about is improper interrogating in violation of Section 8(a)(1).  Contreras was insisting, repeatedly, that he know the subject matter of their conversation.  This creates an implied coercion that talking about the union is not something the employer likes.  Once Contreras learned they talked about the Union, he followed up by discouraging Romero from talking about the Union.  This was not a casual conversation between Contreras and Romero discussing the Union.

As discussed in the prior section, the questioning of Duarte regarding his conversation with Damien was direct coercion as he was told not to speak about the union during work hours and the questioning of Damien regarding his conversation with Duarte was impliedly coercive.  Damien stated that after he told the manager what happened, nobody else from HFF talked to him about the situation.  Damien stated that after Manager Almada talked to him, Almada approached Duarte and took him to an area to talk.  Later, Damien learned that Almada told Duarte not to talk about the union.  Damien stated he is scared management might discriminate against him for his union

1  activity given the termination of Soto and Hernandez and seeing how the managers
2  treat Duarte.   (Id.)   Under all the circumstances, the Court concludes that the
3  interrogation of Duarte and Damien restrains the employees' rights under the Act.  See
4  Bill Johnson's Restaurant, 660 F.2d at 1342.  Accordingly, Petitioner has demonstrated
5  a likelihood of success that Respondent violated Section 8(a)(1) by interrogating
6  employees.

7                    **iii.    Surveillance**

8          Petitioner alleges that Respondent improperly conducted surveillance of Union
9  activities when a supervisor photographed a petition being circulated by employee
10 Duarte that contained the signature of other workers. (Dkt. No. 1, Petition, Duarte Aff.,
11 Ex. 3 at 137).  According to Duarte, around June 27, 2014, he brought a petition to
12 work for employees to sign which he kept in his backpack.  (Id. at 138.)  He informed
13 a coworker that the petition was in his backpack and asked her to read it and sign it if
14 she wanted.  (Id.)  That coworker told other coworkers as Duarte saw others reading
15 the petition by his backpack.  (Id.)  At one point, he noticed that the petition was on the
16 trash can next to his backpack.  (Id. at 139.)  Then he saw his supervisor Katherine
17 Dillenbak open the folder on the trash can and take a picture of the petition with her
18 phone. (Id.)  She then closed the folder and walked away.  (Id.)  After she left, Duarte
19 walked over and put the folder back in the backpack.  (Id.)

20         In opposition, Manager Katherine Dillenbak testified that the elevator room,
21 where the backpack was located, is an access point to her office.  (Dkt. No. 12-1,
22 Resp't NOL, Ex. A, AR 840.)  She testified that she is constantly going in that room
23 and picking things up and moving trash cans.  (Id.)  She saw the petition on top of the
24 trash can so she opened the folder to determine whether it was trash, she glanced at the
25 petition for a few seconds, saw a few signatures and then returned the petition to the
26 trash can and left the room.  (Id. at 840-41.)  She said she did not take out her phone
27 at that time.  (Id. at 841.)

28         An employer violates the NLRA by maintaining "surveillance of the meetings

1  and meeting places of [the union] and of the activities of . . . employees in connection
2  with [the union]." Pennsylvania Greyhound Lines, Inc., 1 N.L.R.B. 1, 48 (1935).
3  Taking photographs of union activity "tends to create fear among employees of future
4  reprisal" when there is no valid justification for the photograph. California Acrylic
5  Industries, Inc. v. NLRB, 150 F.3d 1095, 1099 (9th Cir.1998).

6      These facts are directly disputed and comes down to a credibility issue and the
7  Court cannot conclude that Petitioner will likely succeed on the surveillance issue.

8      **2.    Section 8(a)(3)**

9      Section 8(a)(3) prohibits an employer from discriminating against employees "in
10  regard to hire or tenure of employment . . . to discourage membership in any labor
11  organization." 29 U.S.C. § 158(a)(3). In a retaliatory discharge case, the Ninth Circuit
12  looks to the burden-shifting scheme set forth in Wright Line to assess whether an
13  employer was motivated by anti-union animus. Healthcare Employees Union, Local
14  399 v. NLRB, 463 F.3d 909, 919 (9th Cir. 2006) (citing Wright Line, a Division of
15  Wright Line, Inc., 251 NLRB No. 150 1083, 1089 (1980)). Petitioner must first "make
16  a prima facie showing sufficient to support the inference" that antiunion animus "was
17  a 'motivating factor' in the employer's decision." Wright Line, 251 NLRB at 1089.
18  Petitioner can make such a showing by establishing the following: (1) the employee
19  was engaged in protected union activity, (2) employer had knowledge of that activity,
20  and (3) employer harbored anti-union animus. Frankl II, 693 F.3d at 1062; Ruben ex.
21  Rel. NLRB v. Vista Del Sol Health Servs., Inc., – F. Supp. 3d –, 2015 WL 294101, at
22  *18 (C.D. Cal. Jan. 21, 2015) (citations omitted). Petitioner may use direct and
23  circumstantial evidence to establish anti-union animus. Healthcare Employees Union,
24  Local 399, 463 F.3d at 919.

25      Once this is established, the burden of persuasion "shift[s] to the employer to
26  demonstrate that the same action would have taken place even in the absence of the
27  protected conduct." Wright Line, 251 N.L.R.B. at 1089. While Petitioner retains the
28  ultimate burden of persuasion, "once the General Counsel establishes that anti-union

animus was a motivating factor, the employer bears the burden of establishing any affirmative defense such as the inevitability of termination." Healthcare Employees Union, Local 399, 463 F.3d at 919 (quoting Schaeff Inc. v. NLRB, 113 F.3d 264, 267 n. 5 (D.C. Cir. 1997)).  "The employer cannot meets its burden merely by showing that it had a legitimate reason for its action; rather, it must demonstrate that it would have taken the same action in the absence of the protected conduct." Alternative Energy Applications, Inc., 361 NLRB No. 139, at *3 (2014).

In this case, it does not appear to be disputed that Soto and Hernandez were involved in union activities and HHF managers and owner were aware of their involvement.  The disputed issue is whether the employer was motivated by animus toward the Union. Petitioner alleges that the adverse actions of suspending and terminating Soto, and disciplining, suspending and terminating Hernandez were motivated by animus toward the Union.  Respondent asserts that HFF is not an anti-union company and has actively partnered with the Union in order to gain the food concession business at the airport, just as it had done with the two Unite-Here locals at the airports in San Francisco and Oakland.

### i.    Suspension and Termination of Mirna Soto

Petitioner alleges that Respondent issued a written warning to Soto immediately after she showed a Union flyer to a co-worker and then terminated her because of her support of the union and other protected activity.  The only intervening incident between suspension and termination involved Soto talking to another worker about whether he reported her union activity to Respondent.[5]  Petitioner asserts that Respondent's basis of Soto's suspension and termination of "harassment" and "creating a hostile work environment" is pretextual.  Respondent argues that Soto harassed other employees and created a hostile work environment with other employees.

Soto was hired around September 2013 to work as a server/waitress at the Stone

---

[5]Petitioner does not provide the Court with any citation to the record as to this event.

Brewing outlet at Terminal 2. (Dkt. No. 1, Pet., Ex. 3, Soto Aff. at 110.) Her immediate supervisor was Pete Contreras, the general manager for the Stone Brewing outlet. (Id.) Soto helped with getting employees signatures on the authorization cards from January 2014 to the beginning of March 2014 in the effort by employees to recognize the Union as their exclusive collective bargaining representative. (Id. at 111.) In early May 2014, Soto was selected to be part of the Union's employee bargaining committee. (Id. at 170.) She attended all six bargaining sessions between May and August 2014. (Id.) At the meetings were CEO Kevin Westlye, Directors Maritza Haller and Kimberly Hazard, and an HR representative. (Id.)

Around August 22, 2014, after negotiations, the Union met with the bargaining committee and gave them fliers to pass out to coworkers. (Id.) The flier informed the employees of their rights concerning the appropriate times to talk about the union with fellow co-workers. (Id., Ex. B at 118.) On August 25, 2014, Soto brought a flier with her to work when she and bartender Danny were working. (Id. at 113.) General Manager Contreras was present. (Id.) Soto gave Danny the flier to read and then he gave it back to Soto. (Id. at 113-114.) While Danny was reading it, Contreras came to the bar area to put in an order and did not say anything to Soto. (Id.) Later that morning, Contreras told Soto that Director of Operations Kimberly Hazard ("Hazard") wanted to talk to her. (Id. at 114.) Hazard told Soto that she had too many complaints that Soto was harassing people and suspended Soto without providing any information concerning the alleged harassment. (Id.) On August 27, 2014, Kitchen Manager Zavala called Soto and told her that CEO Kevin Westlye wanted to talk to her on August 28, 2014. (Id.) Union representative Michelle Gutierrez, Director Maritza and Assistant Director of Operations Nick Palaez were all present. (Id.) Westley told Soto that she was being let go because there were too many complaints that she was harassing people and creating a hostile work environment. (Id.; Ex. C at 119.) Soto told them she did not know what they were talking about and they did not provide her the specific reasons for her termination. (Id. at 115.) She states that her termination

1   was the first time she had been accused of any kind of harassment by the employer and

2   she had not received any discipline before her termination.  (Id. at 116.)

3       In response, Petitioner argues that Soto was suspended pending an investigation

4   into employee complaints of harassment and creating a hostile work environment.  She

5   was terminated after the complaints were substantiated and not because of any

6   protected activity.  On August 20, 2014, Soto was speaking Spanish to another

7   employee, Paola Hernandez when Nicholas Palaez, Soto's supervisor walked up. (Dkt.

8   No. 12-1, Resp't NOL, Ex. A, AR at 611 (P. Hernandez); 567 (Schaal); 879 (Palaez).)

9   Since Kara Schaal, a non-Spanish speaking bartender was within earshot as well as

10  customers, Palaez reminded Soto of the Company's policy that employees are to speak

11  only English in front of English-speaking customers and employees.  Soto expressed

12  her disagreement with the policy and argued that there was no one around who did not

13  speak Spanish.  (Id. at 881 (Palaez).)  Palaez then pointed to Schaal who was about

14  three or four feet away, as well as guests who were similarly within earshot.  Soto then

15  said, "I'm going to note this conversation."  (Id. at 879, 881 (Palaez).)  Palaez then

16  went to speak with the general manager, Contreras.  (Id. at 882 (Palaez).)

17      About five or ten minutes later, Soto approached Schaal and accused her, in an

18  aggressive and retaliatory manner, of having told Palaez that she was offended by Soto

19  speaking Spanish.  (Id., AR (Schaal) at 566.)  Schaal told her to calm down and said

20  Soto must have misunderstood.  (Id.)  Soto refused to calm down and proceeded to

21  involve customers of Schaal sitting at the bar.  (Id. at 566-67.)  She stated loudly, "Can

22  you believe this company doesn't let me speak in my native language?  This is

23  bullshit."  (Id.)  Schaal was upset by the accusations and brought this up to her direct

24  manager, Contreras, who told her that Palaez had not implicated Schaal but provided

25  her as an example of an employee who did not speak Spanish.  (Id. at 571.)

26      Soto then engaged in a conversation in Spanish with Paolo Hernandez.  She told

27  Hernandez it was "guera's" fault, referring to Schaal, that she got in trouble.  (Id. at

28  615-16 (Hernandez).)  "Guera" is Spanish lingo for blondie and was not meant by Soto

as a kind word.  (Id. at 616-17.)  Then when she saw Palaez walking some distance away, Soto made a comment that she wished she had the means to pay somebody to do serious physical harm to Palaez.  (Id. at 618-19.)  Hernandez testified that she was really upset at Soto's comment which affected her the whole weekend.  (Id. at 619-24.)  After a couple of days off, since she was still upset from the incident, Hernandez told Contreras about Soto's comments about hurting Palaez.  (Id. at 624.)

On August 22, 2014, Contreras asked Schaal and Hernandez to write a statement about what happened.  (Dkt. No. 12-5, Resp't NOL, Ex. D, Schaal Statement; Dkt. No. 12-6, Resp't NOL, Ex. E, Hernandez Statement.)  The statements and complaints were presented to Kimberly Hazard, Director of Operations, Maritza Haller, Senior Director of Operations, and Kevin Westlye, President and an investigation began.  On the morning of August 25, 2014, while Haller was driving to work and on the phone with Contreras, he told Haller that he felt there was tension in the restaurant and that bartender Danny O'Rourke appeared uncomfortable talking to Contreras in Soto's presence.  (Dkt. No. 12-1, Resp't NOL, Ex. A, AR 1162 (Hazard).)  They made a decision to suspend Soto's employment while continuing the investigation into the allegations of hostile work environment and potential harassment.  (Id.)  Therefore, upon arriving to work, Hazard met with Soto and suspended her employment.  (Id., AR 1163.)  Then once the investigation was complete, on August 27, 2014, Respondent terminated Soto's employment without providing her with specific reasons.  (Id.)  Westlye explained that he did not provide much information to Soto because she had already threatened and retaliated against an employee, and he was not sure if there would be any further retaliation so he kept the termination meeting short and simple.  (Dkt. No. 12-1, Resp't NOL, Ex. A, AR 1122.)

While Soto recalls Palaez reminding her to speak English, she questioned it and then complied. (Dkt. No. 1, Pet., Soto Suppl. Aff. at 121-22.)  She denies talking to P. Hernandez afterwards, denies harassing Schaal, denies making comments to customers, and denies making a comment about hiring someone to hurt Palaez.  (Id.)

Petitioner has made a prima facie showing of a violation of Section 8(a)(3) by demonstrating that the employer harbored anti-union animus. The timing of Soto's suspension right after she showed a Union Flyer to a co-worker is suspicious and can be an indication of the employer's anti-union animus. See Healthcare Employees Union, 463 F.3d at 919. Anti-union animus is also exemplified by the fact that Soto was not provided with the specific reasons for her suspension and termination; and Soto was not provided with any written warnings, regarding harassment and creating a hostile work environment, as other employees received prior to termination. (Dkt. No. 12-9, Resp't NOL, Ex. H at 17-23.)

On the other hand, Respondent has presented compelling evidence disputing Petitioner's facts as to the reasons why Soto was terminated. Respondent provided testimony from three witnesses and written statements from two of the witnesses that Soto harassed Schall and customers, and threatened physical harm to a supervisor on August 20, 2014. While there may have been grounds to suspend Soto based upon these witness statements, the alleged anti-union animus and disparate treatment of Soto in her termination[6] provides a likelihood of success that Respondent violated Section 8(a)(3) by terminating Soto. However, while the Court recognizes that its role in a 10(j) injunction is to protect the integrity of the bargaining process and to preserve the Board's remedial power, see Frankl I, 650 F.3d at 1341, the Court has concerns that reinstating Soto to her same position would undermine the morale of the workplace. This concern will be addressed further in the balance of hardship section below.

**ii.   Discipline, Suspension and Termination of Francisco Hernandez**

Petitioner argues that Hernandez was suspended for talking to a co-worker about the Union. Moreover, at the time of his suspension, he was told not to circulate a

---

[6]A review of the employee disciplines submitted by HFF in its opposition shows that as to harassment and creating a hostile work environment, all employees, except one, were given written warning, suspensions, and final corrective actions, and not immediately terminated. (Dkt. No. 12-9, Resp't NOL, Ex. H at 17-23.)

[15cv0039-GPC(JLB)]

petition to his co-workers.  (Dkt. No. 1, Pet., Ex. 3, Hernandez Aff. at 129-30.)  Then within a few days of his initial suspension, he was issued a final warning, suspended again and then terminated.  One of the reasons for his termination was failure to mark invoices but Respondent has provided no credible evidence that this conduct resulted in discipline for other employees in the past.  Despite Hernandez' prior disciplines, the August 2014 discipline, suspension and termination was the result of Hernandez' involvement with the Union.  Respondent argues that the Hernandez was terminated due to repeatedly failing to follow a job requirement of checking in product deliveries as they arrived.

Hernandez was employed with HFF in Utilities[7] in Terminal 1 in June 2013.  (Id. at 124.)  In September 2013, he moved to Utilities in Terminal 2.  (Id.)  Hernandez was also an active and open union supporter who participated in every bargaining session with Respondent.  (Id. at 125.)  He states that after he became involved in the Union, Mike Zavala, the manager for Stone Brewing, began treating him differently.  (Id. at 126.)

In August 2014, Hernandez was warned about posting a Union flyer on a bulletin board on top of a company memo which Hernandez denies.  (Id. at 128-29.)  On August 2, 2014, Hernandez brought a flier to work that the Union had prepared and given to him about upcoming negotiations.  (Id. at 128.)  Hernandez decided to post the flier at work and posted it on the same bulletin board where the employer posts its notices for employees.  (Id.)  He posted the flier below a memo from the employer and did not cover any other memos that were posted.  (Id.)  He did not know if he was allowed to post material on this board but he had seen other postings from the Union

---

[7]Utilities employees provide the products, such as produce and dry goods, to the restaurants.  (Dkt. No. 1, Pet., Ex. 3, Hernandez Aff. at 124.)  His job involved unloading a shrink-wrapped pallet that contained the provisions delivered by outside vendors.  (Dkt. No. 12-1, Resp't NOL, Ex. A, AR at 179-80.)  He took the items off the pallet and put them where they belonged.  If the vendor failed to deliver a product item listed on the invoice, it was Hernandez' responsibility to notify the appropriate restaurant manager that the product was missing.  (Id.)  The products were received and stored in an area underneath the restaurants and Hernandez was responsible for delivering products from the storage areas to the five restaurants in Terminal 2.

1  on the board so he thought it was okay.  (Id.)

2      Later that day, Nick Palaez called Hernandez into a meeting and gave him a

3  written warning for supposedly posting the memo on top of a company memo.  (Id.)

4  Hernandez stated that he did not post the flier on top of a company memo but Palaez

5  said he did and that he saw it.  (Id. at 129.)  He also stated that employees are supposed

6  to notify management before posting anything on the board.  (Id.)

7      On August 1, 2014, HFF managers warned Hernandez about his failure to

8  properly mark invoices even though the evidence revealed that HFF had not warned

9  any other employees for similar alleged infractions.[8]  (Id. at 128.)  On August 1, 2014,

10  Contreras and Magdalena Bischoff met with Hernandez and informed him that he had

11  to mark the invoices when products were received.  (Id. at 127.)  Hernandez states that

12  prior to this  time, he was never told to mark invoices or trained on how to do it.  (Id.)

13      Hernandez states that a few days before, Contreras told him that he was supposed

14  to be marking the invoices but Hernandez was confused because it had not been

15  brought up before and so he did not respond.  (Id.)  After August 1, Hernandez states

16  he started marking the invoices when he received the products.  (Id.)  On August 6, he

17  accepted and marked for delivery products which included spring mix.  (Id. at 128.)

18  On August 7, 2014, Contreras and Hazard met with Hernandez and told him they had

19  a missing product, a spring mix, that Hernandez marked as received.  (Id.)  Hernandez

20  said he remembered receiving it but was not certain because it was the day before.  (Id.)

21  Hazard gave him a written warning for this.  (Id.)  Hernandez asserts that HFF does not

22  normally discipline employees for making mistakes on invoices and is not aware of any

23  other employees who have been disciplined for making mistakes on invoices.  (Id.)  A

24  fellow Terminal 1 Utilities employees, Amir Hernandez, told him that they made those

25  mistakes all the time without being disciplined.  (Id.)

26      On August 9, 2014, Hernandez was then suspended for speaking to a co-worker

27  about the Union while Hernandez was on break from work but the coworker was not.

28

---

[8]This new requirement came into effect in July 2014.

[15cv0039-GPC(JLB)]

(Id. at 129-30.) He was also not to circulate union petitions at work. (Id.) On that day, Hernandez was taking his lunch break at the Phil's BBQ outlet and no customers were there at the time, and he joined the conversation Jesse Hancher and Michelle Brown were having about the Union. (Id. at 129; Dkt. No. 12-1, Resp't NOL, Ex. A, AR at 194-202.) Employee Michelle Brown was on a break and Jessie Hancher was working and cleaning tables. (Dkt. No. 1, Pet., Ex. 3, Hernandez Aff. at 129.) Hernandez, talked to Jessie, not a Union supporter, about the Union and the conversation lasted about five or ten minutes. (Id.) After the conversation ended, Hernandez remained in the area another 10 minutes until his break ended. (Id.) A few hours later, Palaez and Jay Miller, a Manager, met with Hernandez and told him he was not supposed to be approaching co-workers during working hours and talking about outside business when people are on the clock. (Id.; Dkt. No. 12-1, Resp't NOL, Ex. A, AR at 198-99.) At the meeting, Palaez also mentioned that Hernandez should not have had people sign a petition during work. (Dkt. No. 1, Pet., Ex. 3, Hernandez Aff. at 129.) Since this issue about the petition was brought up to him before, Hernandez was suspended for a day as well as for talking about outside business when people were on the clock. (Dkt. No. 1, Pet., Ex. 3, Hernandez Aff. at 129; Dkt. No. 12-1, Resp't NOL, Ex. A, AR at 200.) When Hernandez asked if Jessie would get disciplined also, Palaez said it did not concern him. (Dkt. No. 1, Pet., Ex. 3, Hernandez Aff. at 130.) He does not believe Jessie got disciplined. (Id.) He was suspended on August 10, 2014. (Id.) Hernandez states that employees regularly talk about issues unrelated to work and personal issues on work time and they are not disciplined for that. (Id.)

The following day after his suspension, Hernandez returned to work on August 11, 2014, and he was called into a meeting with Director of Operations Kimberly Hazard and Contreras. (Id. at 130.) Hazard handed him a Final Written Warning which detailed the employer's version of the incidents. (Id. at 133.) Hazard informed him that if he did not follow company procedures in the future, he would be terminated. (Id.)

On August 15, 2014, Hernandez marked all items as received but HFF later found out from the vendor that the vendor had not been able to deliver the sausage. (Id. at 131.)  Hernandez asserts that he correctly marked the invoice for the sausage on August 15.  (Id.)  Even if he did make a mistake, he was not aware of any other employees being disciplined or terminated for incorrectly marking an invoice. (Id.) On August 16, 2014, before he was to clock in, Jay Miller asked for his airport ID badge because he was to be suspended another two days for his failure to mark the invoice regarding the sausage. (Id. at 130-31.)  Then on August 18, 2014, Hernandez went to the airport and met with Hazard and Director Maritza Haller. (Id.)  Hazard gave him a termination notice. (Id.)

Respondent asserts that Hernandez was given many opportunities to correct the checkmark errors.  Contreras testified that in July 2014, he was missing a large dollar amount of straws, and investigated the invoice, contacted the delivery company and discovered that Hernandez checked in the order. (Dkt. No. 12-1, Resp't NOL, Ex. A, AR at 726, 727.)  When he asked Hernandez about it, he stated that he checked the order in. (Id. at 728.)  Contreras explained that all items needed to be checked and it was really important to make sure they have everything on the invoice. (Id.)  He stated that from now on, he wanted to see a check mark next to each item that comes in to make sure that they got all the items on the invoice. (Id.)  Hernandez answered "yeah." (Id.)  Hernandez then said that if he had to do that, he would have to be given more time to work. (Id. at 728-29.)  Contreras responded that it should only take a few additional seconds to mark the invoice. (Id. at 729.)  Hernandez responded that he understood. (Id. at 730.)  Within another week, Contreras had another conversation with Hernandez about not checkmarking the invoices because he noted that there were no checkmarks on any of the invoices when Hernandez had worked. (Id. at 730-31.) Contreras approached Hernandez about it and he responded that he was "just really busy." (Id. at 731.)  Contreras emphasized the importance of checking the invoices and if he could not do it, he should inform management. (Id.)  Hernandez responded that

he understood.  (Id.)  Again in another week, he noted that the invoices did not have a check mark next to each item and there were only initials and one big checkmark. (Id. at 732.)  He decided he needed to have a serious counseling session, and to put a note in his file. (Id.)  He contacted Magdalena, another general manager, and asked her to sit in on the counseling session with Hernandez.  (Id.)  At the session, Hernandez stated that he did not understand how to do it.  (Id.)  He said he was checkmarking the invoice but Contreras explained that he had to checkmark every single item.  (Id. at 733.)  He indicated "I just don't get what you want." (Id. at 734.)  Then Magdalena reiterated what was expected and he then said "Oh, now I get it."  (Id.)  When Contreras informed him that he was going to put a note in his file, Hernandez responded, "well, I want to see the rule book.  Where does it say in the rule book that I have to put a checkmark next to each item?" (Id. at 734-35.)  Contreras explained that not all tasks are in the rule book.  (Id. at 735; Ex. Q.)

In this case, the Court concludes the Petitioner has provided "some evidence" that Respondent acted with anti-union animus and violated Section 8(a)(3).  See Frankl I., 650 F.3d at 1356.  While the facts are disputed, the Court notes that the stated reason Hernandez was suspended on August 9, 2014 was because he was talking about the union with fellow employee, Jesse Hancher while he was working, and for distributing a petition during work hours.[9]  As discussed above, this violates Section 8(a)(1). Moreover, Petitioner has not shown that Hancher, not a Union supporter, was disciplined for talking about the Union with Hernandez while Hancher was working. This demonstrates that Hernandez was singled out since he was union supporter.

### 3.    Section 8(a)(5)

Petitioner alleges that Respondent, in violation of Section 8(a)(5) of the Act, unilaterally implemented a new employee handbook in April 2014 after the Union was selected to represent them and before negotiations for an initial collective bargaining

---

[9]The Final Written Warning dated August 11, 2014 lists other instances of violations of company policies and procedures.

agreement.  (Dkt. No. 1, Pet., Ex. 3 at 54-103.)   Moreover, Respondent required employees to sign an acknowledgment form agreeing that Respondent may unilaterally change the terms of conditions of employment.  Respondent asserts that the changes were merely revisions and clarified the existing provisions in the handbook to comply with changes in California law and to clarify existing policy.  It did not issue new work rules.  Moreover, Respondent asserts that the Union has never complained or raised an issue regarding the issuance of the April revised handbook.

Section 8(a)(5) states that it "shall be an unfair labor practice for an employer (5) to refuse to bargain collectively with the representatives of his employees, subject to the provisions of section 159(a) of this title."  29 U.S.C. § 158(a)(5).  This section imposes a duty on employers to bargain collectively over the terms and conditions of employment, which include rates of pay, wages, hours of work, or other conditions of employment. NLRB v. Katz, 369 U.S. 736, 742-43 (1962); Frankl v. Fairfield Imports, LLC, No. 13cv2354-KJM-AC, 2014 WL 130937, at *13 (E.D. Cal. Jan. 14, 2014).  An employer's unilateral change, without notice and a reasonable opportunity to bargain, regarding conditions of employment is a violation of § 8(a)(5) even in the absence of subjective bad faith.  Katz, 369 U.S. at 743 ("We hold that an employer's unilateral change in conditions of employment under negotiation is similarly a violation of § 8(a)(5), for it is a circumvention of the duty to negotiate which frustrates the objectives of § 8(a)(5) much as does a flat refusal.")  However, clarifying existing company policy which was fully encompassed within its existing policy is not a topic that requires bargaining.  Allied Mechanical Servs., Inc., 320 N.L.R.B. 32, 32 (1995); Aaron Bros. Co. v. NLRB,  661 F.2d 750, 753 (9th Cir. 1981) (holding "that wage changes that merely reflect continuations of past company policy are not considered changes in existing work conditions").

Respondent uses a company wide handbook which is used at all three facilities and is updated every year to comply with changes to California law.  (Dkt. No. 12-2, Ex. A, AR at 1311-12.)  Respondent asserts that the revisions were made to update any

changes in the law and to clarify provisions in the handbook. (Id. at 1337-1343.) For example, as to attendance, the 2013 handbook stated that if you are late, you are subject to corrective action and emphasized the importance of being on time. (Id. at 1338:19-25.) In 2014, Respondent made the language clearer by categorizing the tardiness based on the number of minutes an employee is late. (Id. at 1338:24-1339:12.) If an employee is 3-15 minutes late, it will be considered excessive tardiness but there will be no corrective action. (Id.; Dkt. No. 1, Pet., Ex 3 at 72.) Tardiness greater than fifteen minutes may result in disciplinary action. (Dkt. No.1 , Pet., Ex. 3 at 72.) In its opposition, Respondent only describes one of the many change made to the 2014 handbook.

Despite Respondent's argument that the attendance/tardiness provisions were clarified, the "Highlights of changes to 2014 handbook" provides a three and a half page single spaced description of the changes to the 2014 handbook. (Dkt. No. 1, Pet., Ex. 3 at 55-58.) These include Absences, Unreported Absences, Reporting on Absence or Tardy, Safety and Injury Prevention, Standards of Conduct, and many other provisions. (Id.) Respondent does not address how all these provision are clarifications of the existing handbook.[10]

Accordingly, the Court concludes that Petitioner has demonstrated a likelihood of success on the merits as to the violation of Section 8(a)(5) by unilaterally revising the 2014 handbook without first consulting the union. Moreover, the Employee Acknowledgment Form stated, "I understand that except for employment at-will status, High Flying Foods can change any and all policies or practices at any time. I also understand that new policies may be added as High Flying Foods grows. The restaurant reserves the right to change my hours, wages, benefits and working conditions at any time." (Dkt. No. 1, Petition, Ex. 3 at 54.) This notice that the employer can unilaterally make changes to all policies tells employees that the employer has no respect for the Union and the Union will not effectively represent

---

[10]A copy of the pre-existing handbook was not provided to the Court.

them.  This is also in violation of Section 8(a)(5).  Accordingly, the Court concludes that Petitioner has demonstrated a likelihood of success on the merits on the issues under Section 8(a)(5).

**B.      Irreparable Harm**

Petitioner argues that Respondent's action will irreparably harm the national labor policy encouraging collective bargaining, the employee's right to organize and the Board's remedial powers.  Moreover, since the Union is the newly recognized representative chosen by the employees and a collective bargaining agreement has not been reached, the employees are more susceptible to employer's unfair labor practices.

Respondent opposes contending that sporadic and isolated events Petitioner alleges are unlawful and are not serious enough to warrant equitable relief.  If the NLRB finds in favor of Petitioner, it can order Soto and Hernandez reinstated and compensate them for any losses.  There is also no allegation that any alleged unfair labor practices are ongoing.

The Ninth Circuit has repeatedly held that "permitting an alleged unfair labor practice to reach fruition and thereby rendering meaningless the Board's remedial authority is irreparable harm."  Small v. Avanti Health Sys., LLC, 661 F.3d 1180, 1191 (9th Cir. 2011).  "[W]hile a district court may not presume irreparable injury with regard to likely unfair labor practices generally, irreparable injury is established if a likely unfair labor practice is shown along with a present or impending deleterious effect of the likely unfair labor practice that would likely not be cured by later relief."  Frankl I, 650 F.3d at 1362.

Here, attendance at union meetings has decreased and support for the Union has declined.  In January and February 2014, the weekly union meetings were attended by about twelve to eighteen employees and the numbers have gone down to about six to eight employees, which includes the six members of the bargaining committee.  (Dkt. No. 1, Pet., Ex. 3, Gutierrez Aff. at 105.)  As to attendance at the bargaining session, in May 2014 a total of about 60 employees attended and in August, when the parties

met for negotiations with a federal mediator, about 25 attended. (Id. at 106.) Since then two other bargaining sessions occurred and the only employees that attended were the four or five bargaining committee members. (Id.) Moreover, Hernandez, who was considered a Union leader, and Soto often spoke to employees about the union but since their terminations, it has made it impossible for the committee to keep other employees informed and employees seem scared to openly discuss the union or participate. (Id.) Employees state that after the termination of Soto and Hernandez, less people are talking about the union. (Dkt. No. 1, Pet., Ex. 3, Rossworn Aff. at 160-61; Escamilla Aff. at 163-66.) In fact, employees are scared they will be a target of termination if they talk about the union. (Id. at 160, 165.)

As noted above, Petitioner's showing of likely violations of the Act were not sporadic and isolated as they all occurred within a small time frame. It appears that HFF's failure to bargain in good faith, interfering with the employees' right to organize and bargain collectively and discouraging membership in the Union has negatively impacted the Union. As time passes, the harm will only increase and be more permanent. Accordingly, the Court concludes that irreparable harm is likely absent an injunction as to Petitioner's showing of likely violations of the Act.

As to the termination and suspension of Mirna Soto, the Court concludes that because Petitioner has not shown that the hardships, as described below, weigh in favor of Respondent, Petitioner cannot demonstrate irreparable harm.

**C.    Balance of Hardships**

Petitioner argues that the Union has already lost the confidence of the employees and the bargaining efficacy of the Union will be severely undermined. It asserts that there is little risk to Respondent to comply with provisions of the Act and to reinstate Soto and Hernandez during the interim.

Respondent argues that the hardships weigh in favor of it. If Respondent were required to reinstate Soto, its employees would be subject to unlawful harassment and threats of violence which would result in extreme hardship to Respondent and its

1    employees. Moreover, if Respondent were forced to reinstate Hernandez, it would
2    demonstrate that employees are excused from performing tasks that they dislike so long
3    as they make their union activity known.

4    "[I]n considering the balance of hardships, the district court must take into
5    account the probability that declining to issue the injunction will permit the alleged[
6    ] unfair labor practices to reach fruition and thereby render meaningless the Board's
7    remedial authority." Frankl I, 650 F.3d at 1365 (quoting Miller, 19 F.3d at 460).   The
8    court's determination that Petitioner has shown likely irreparable harm means that the
9    balance of hardship tips to its side.  Id.

10   The Court concludes that reinstating Soto to her prior position would probably
11   result in hardship to Respondent and its employees. Soto's behavior and attitude would
12   negatively affect the morale of the work environment and potentially lead to loss of
13   business. Meanwhile, given that the Court is granting an injunction based upon
14   multiple theories, it is unlikely that the alleged unfair labor practices will reach fruition
15   and render meaningless the Board's remedial authority.  See id.

16   However, reinstating Hernandez would not result in hardship to Respondent.
17   His Utilities position allowed him to work independently without much interaction with
18   employees or customers.   Therefore, not reinstating Hernandez would permit the
19   alleged "unfair labor practices to reach fruition and thereby render meaningless the
20   Board's remedial authority."  See Frankl I, 650 F.3d at 1365.

21   As to the remaining issues where Petitioner has established a likelihood of
22   success, and likely irreparable harm, the balance of hardship weighs in favor of
23   Petitioner.  See id.

24   **D.   Public Interest**

25   Petitioner maintains that the public interest supports an injunction because an
26   injunction will ensure that unfair labor practices will not succeed and will serve to deter
27   continued violations, and would protect the employees' right and allow the Union to
28   bargain on their behalf without fear of reprisal and to ensure Respondent's unfair labor

practices do not succeed.  Respondent contends that there is no public interest because Petitioner has failed to demonstrate likelihood of success on the merits or irreparable harm.

"In § 10(j) cases, the public interest is to ensure that an unfair labor practice will not succeed because the Board takes too long to investigate and adjudicate the charge." Frankl I, 650 F.3d at 1366.  "The task of the Board in devising a final remedy is 'to take measures designed to recreate the conditions and relationships that would have been had there been no unfair labor practice.'"  Franks v. Bowman Transp. Co., 424 U.S. 747, 769 (1976) (internal quotation marks omitted).  The most effective way to protect the Board's ability to recreate the relationship and restore the status quo is for the court itself to order a return to the status quo.  Frankl I, 650 F.3d at 1366.  A strong showing of likelihood of success and of likely irreparable harm will establish that Section 10(j) relief is in the public interest.  Id. at 1365.

Here, there is a showing of likelihood of success and irreparable harm and that the balance of hardship weigh in favor of Petitioner as to issues concerning prohibiting union talk during work hours, interrogating employees, terminating Hernandez, and revising the 2014 handbook.  Thus, the Court concludes that there is a public interest in making sure the unfair labor practices demonstrated do not succeed.  However, there is no public interest in reinstating Mirna Soto since there has not been a showing of likely irreparable harm to Soto and a likelihood of hardship to Respondent's employees.  See id.

As discussed, all four Winter factors support the grant of a 10(j) injunction regarding the violations of Section 8(a)(1) as to prohibiting union talk during work hours, and interrogating employees; Section 8(a)(3) as to Hernandez' termination; and Section 8(a)(5) as to the 2014 handbook revisions.

### Conclusion

Based on the above, the Court GRANTS in part and DENIES in part Petitioner's petition for injunction pursuant to 10(j) of the Act, 29 U.S.C. § 160(j).  Specifically,

the Court GRANTS the Petition as to Section 8(a)(1) concerning prohibiting union talk during work hours, and interrogating employees; Section 8(a)(3) as to Hernandez' termination; and Section 8(a)(5) as to the 2014 handbook revisions.  The Court also DENIES the Petition as to Section 8(a)(1) concerning the surveillance claim; and Section 8(a)(3) concerning the suspension and termination of Mirna Soto.

   IT IS SO ORDERED.


DATED:  February 12, 2015


         HON. GONZALO P. CURIEL
         United States District Judge